FILED
2008 Jan-04  PM 03:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| THE JEFFERSON COUNTY BOARD OF EDUCATION, | } |
| | } |
| | } |
| Plaintiff/Counter-Defendant | } |
| | } |
| | } |
| v. | } CIVIL ACTION NO. |
| | } 07-AR-0927-S |
| MS. L, individually, and as parent, guardian, next friend, and legal representative of R.G., a minor, | } |
| | } |
| | } |
| | } |
| | } |
| | } |
| Defendant/Counter-Plaintiff. | } |

**MEMORANDUM OPINION**

Before the court are the parties' cross motions for summary judgment or, in the alternative, judgment on the record. Both parties appeal the decision of a state hearing officer pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq*. For the reasons that follow, both motions will be granted in part and denied in part.

### *Factual and Procedural History*

R.G. was born on January 22, 1999 and is the son of Ms. L. He lives with his mother and two sisters in Birmingham, Alabama. R.G. enrolled in kindergarten at Center Point Elementary School ("Center Point"), which is part of the Jefferson County school system, at the beginning of the 2004-2005 school year. Before enrolling in

1

school, R.G. had been diagnosed with and was being treated for Attention Deficit Hyperactivity Disorder ("ADHD") by his psychologist, Dr. Barry Adams ("Dr. Adams").[1] R.G. was taking medication prescribed by Dr. Adams to trest his ADHD. Despite the treatment, R.G. exhibited a variety of troubling behaviors during the beginning of kindergarten; such as kicking, hitting, refusing to follow directions, throwing objects, and running away from the classroom. He was suspended twice at the beginning of the school year for slapping or kicking other students. In response to R.G.'s inappropriate conduct, Missy Fleagle ("Fleagle"), a school counselor who focused on behavior issues, drafted a behavior intervention plan for R.G. on September 20, 2004. In drafting the intervention plan, Fleagle noted that R.G. had difficulty dealing with unstructured settings, such as group work, and responded better to structure, consistency, and clear consequences. The plan included a provision allowing R.G. to ask his teacher for a pass to leave the classroom to see Fleagle when he was feeling frustrated and allowed him to earn rewards from Fleagle when he behaved appropriately. Although Fleagle testified that, with the aid of a new kindergarten teacher, R.G.'s behavior generally improved after the implementation of the behavior intervention plan, he continued to sporadically misbehave during kindergarten. Ms. L testified that

---

[1] Dr. Adams also diagnosed R.G. as having a mood disorder and an anxiety disorder.

she was called to pick R.G. up from school early on many occasions because of his misconduct. R.G.'s behavioral difficulties during kindergarten were no doubt made worse by the transition in teachers (including a series of substitute teachers) and the fact that he and his family moved to a different neighborhood at some point during the year.

Because of his continued inappropriate behavior, R.G. was referred to the Building Based Student Support Team ("BBSST") on March 15, 2005. BBSST is a pre-referral program that offers regular education teachers assistance and additional tools to deal with academic and behavioral issues. BBSST is a by-product of the *Lee v. Macon County Board of Education* consent decree.[2] On April 1, 2005, the BBSST team, which included Ms. L, met to discuss R.G.'s behavior. The team members decided to meet again to consider a revised behavior intervention plan.

On April 25, 2005, the Board received a letter from Dr. Beverly Von Der Pool, R.G.'s pediatrician, stating that R.G. was being treated for ADHD and requesting that the Board provide "any further educational testing that may be available to [R.G.]." On April 27, 2005, the BBSST team met to determine whether, in light

_____

[2] In *Lee v. Butler County Board of Education,* 2000 WL 33680483 (M.D. Ala. Aug. 30, 2000), Judge Myron Thompson entered a consent decree requiring the State of Alabama to institute certain reforms designed, *inter alia*, to reduce the over-identification of African-Americans as "emotionally disturbed." The consent decree required that BBSST be used as a prereferral intervention strategy before a child is referred for special education services. *Id.* at *4; *see also* Ala. Admin. Code 290-8-9-.1(2) (codifying the BBSST requirement).

of Dr. Von Der Pool's letter, R.G. should be referred for special education services. At this meeting, a revised behavior intervention plan was developed that reinforced and added to the strategies that were already in place. During the meeting, after being presented with special education as an option, Ms. L stated that she did not think R.G. should be referred for special education services and did not want to pursue special education testing. The Board sent a letter to Ms. L the next day requesting that she attend a meeting to determine R.G.'s eligibility for services under § 504 of the Rehabilitation Act.

On May 2, 2007, a § 504 eligibility meeting was held. Ms. L attended the meeting and was accompanied by a relative who was a principal with the Birmingham City School System and had a basic familiarity with special education services. At the meeting, it was determined that R.G. was ineligible for § 504 services because his ADHD was not substantially limiting his ability to learn. Ms. L acknowledges telling the other participants at the § 504 meeting that she did not want R.G. tested for special education services. However, she also claims that at the time of the meeting she did not have a full understanding of what special education services entailed and that school officials never explained the process to her. Ms. L contends that she did not fully understand her rights under the IDEA until they were explained to her by the attorney representing her in the case at bar. R.G. continued to be monitored

by the BBSST for the remainder of kindergarten; however, at the end of the school year, R.G. was suspended for three days after he turned over furniture and computer equipment in a classroom during an emotional outburst. Despite his behavioral difficulties during kindergarten, R.G. met or exceeded all academic requirements.

During R.G.'s first grade year at Center Point, the behavior intervention plan remained in effect and the BBSST continued to monitor his behavior. At the beginning of the school year, Fleagle spoke with Dr. Adams about R.G.'s behavior plan and his progress over the summer. According to Fleagle, Dr. Adams told her to continue doing what she was doing and that she was doing more than he would be able to do. R.G.'s teacher, Melissa Bell ("Bell"), kept a daily behavior log to keep track of her students' behavior. However, Bell admits that some behavior went unrecorded. R.G.'s behavior log for the first half of the school year reflects sporadic episodes of inappropriate behavior, including a few suspensions. During this period, R.G. was disciplined for, among other things, striking other students, throwing objects, leaving the classroom, kicking, using obscene gestures, and defiance. Some of R.G.'s difficulties occurred in physical education ("P.E."), which was more unstructured than the normal classroom environment. In an effort to reduce R.G.'s misbehavior, Fleagle devised a plan that allowed R.G. to stay with her during part of the P.E. period.

Although R.G. continued to exhibit some inappropriate

5

behaviors during the second half of the first grade year, as reflected in Bell's behavior logs, his behavior did improve. Over time, Fleagle's one-on-one time with R.G. decreased and R.G. was better able to deal with frustration. Fleagle also observed that R.G. learned to accept direction from his teacher. Bell testified that R.G. was well-liked by his classmates and was generally able to get along well with his peers. However, Ms. L contends that R.G. never interacted with any of his classmates outside of school; although she does admit that he played with a family friend. While Fleagle had to intervene to address R.G.'s behavior less often as the first grade year progressed, he was suspended on two occasions in April. One suspension arose out of fighting and the other stemmed from an incident in which R.G. threw pencils and hit other students. Throughout first grade, R.G. maintained good grades, mostly As and Bs.

On November 14, 2005, Dr. Adams wrote the Board a letter expressing his approval of the intervention strategies that were being used with R.G., such as the use of time-outs and calm down periods, and suggested some additional approaches that might be helpful. Ms. L states that the letter was written in response to her telling Dr. Adams that the school's behavior plan was not working. The letter also made reference to R.G.'s "IEP" (Individual Education Plan), which suggested to school officials that Dr. Adams was operating under the assumption that R.G. had already been

deemed eligible for special education services under the IDEA. The BBSST met with Ms. L on November 22, 2005 to discuss the letter. At the meeting, school officials proposed to Ms. L that R.G. be evaluated for special education services. Ms. L deferred consenting to the evaluation until she could consult with Dr. Adams. On December 9, 2005, Ms. L signed a consent form allowing R.G. to be evaluated for special education services. On December 14, 2005, school officials accepted R.G. for special education evaluation.

After determining that R.G. should be evaluated for special education services, the Board completed a wide range of assessments as part of the evaluation process. Between December 2005 and April 2006, Ms. L and some of R.G.'s teachers and counselors completed a variety of behavioral rating scales, and R.G. was given vision, hearing, intelligence, and achievement tests. A 15-minute behavioral observation was also conducted by an intern pursing a masters degree in social work. On April 4, 2006, the Multi-Disciplinary Eligibility Determination Committee ("MEDC") met to review the results of the evaluation. At this meeting, it was decided that because R.G. had been diagnosed with ADHD, another behavior rating scale, the Behavior Rating Inventory of Executive Function ("BRIEF"), should be completed.

Once the BRIEF was completed, the MEDC, which included Ms. L, reassembled on April 10, 2006 to consider R.G.'s eligibility under the IDEA. The MEDC reviewed, *inter alia*, the various assessments,

7

the behavior observation, grades, attendance records, disciplinary records, behavior logs, and reports from Dr. Adams. After reviewing all of the records and assessments, as well as considering the input provided by the members of the team, it was decided that R.G. did not qualify for special education services. Ms. L signed the eligibility form, signifying her agreement with the eligibility determination reached by the MEDC. Ms. L also stated at the meeting that she did not expect R.G. to be found eligible for services; however, Ms. L now asserts that she made the statement under the belief that a child could only be eligible for special education if his grades were affected by his disability, which was not the case with R.G. As a consequence of his ineligibility for special education services, R.G. was referred back to the BBSST.

On April 24, 2006, R.G. was suspended. Because of R.G.'s cumulative number of suspensions, he was referred to the Jefferson County Board of Education to determine whether he should be assigned to an alternative school. Ms. L attended the Board hearing and presented the Board with a letter from Dr. Adams that explained the etiology of R.G.'s behavior problems and opined that R.G. met the qualifications for a disabling condition under the "other health impairment" category of the IDEA.[3] The Board determined that R.G. should be assigned to an alternative school for ten days,

---

[3] At the due process hearing, Dr. Adams testified that R.G. met the qualifications for emotional disturbance because he exhibited inappropriate thoughts and feelings under normal circumstances. (Tr. at 1156.)

8

which would be reduced to five days if he exhibited good behavior. In response to Dr. Adams's letter, school officials proposed to meet with Ms. L to determine if Dr. Adams's referral warranted R.G. receiving further evaluation. Concerned about the impact the alternative school environment would have on her son, Ms. L sought the assistance of counsel.

On May 2, 2006, Ms. L's attorney sent the Board a letter informing it that she would be requesting a due process hearing and notifying it that, as mandated by the IDEA, R.G. must "stay put" in his current educational placement, as opposed to the alternative school. The letter contained the following operative language:

> Finally, please note that we are contesting the District's evaluations, *inter alia*, in that they were not comprehensively sufficient and led to the erroneous conclusion that [R.G.] is not eligible for any services. Thus, my client seeks an independent educational evaluation at public expense. If you deny such request, you must request an impartial due process hearing on behalf of the District in order to avoid liability for my client's independent evaluation, which she is now in the process of securing.

Susan Wirt ("Wirt"), the Director of Exceptional Education for the Board, received the letter from Ms. L's attorney on May 4, 2006.

On May 5, 2006, Ms. L filed a due process complaint with Alabama Department of Education. In accordance with the requirements of the IDEA, the Board convened a resolution meeting on May 15, 2007 to attempt to resolve Ms. L's complaints without the need for a due process hearing. Ms. L attended the resolution meeting unaccompanied by counsel. A resolution agreement was

reached containing the following relevant provisions: 1) R.G. would remain at Center Point, 2) R.G. would be allowed to make-up missed school work, 3) R.G. would be promoted to second grade, 4) R.G. would be reevaluated[4] for special education services by May 18, 2006, 5) the resolution team would reconvene on May 19, 2007 to sign a final resolution agreement reflecting the eligibility decision, and 6) implementation of the resolution agreement would resolve all pending due process issues. Ms. L signed the resolution agreement; however, she testified that she only did so because she was told that the agreement would not be finalized until a subsequent meeting was held. In accordance with the agreement, R.G. was immediately readmitted to Center Point. However, the next day, Ms. L's attorney wrote the Board a letter revoking Ms. L's consent to the resolution agreement and objecting to the convening of any further meetings of the MEDC. However, the letter expressed Ms. L's desire that the Board conduct additional evaluations and that R.G. remain at Center Point. R.G. remained at Center Point despite the revocation of the agreement.

As part of her efforts to obtain an Independent Educational Evaluation ("IEE"), Ms. L, through her attorney, contacted Dr. John Goff ("Dr. Goff"). On October 18, 2006, Dr. Goff conducted a

---

[4] Ms. L specifically consented to additional assessments in the areas of behavior, speech/language, and ADHD. However, the Board did not conduct the reevaluation, because Ms. L revoked the resolution agreement. Because of Ms. L's revocation of the agreement, the Board's failure to conduct a reevaluation, including a speech and language assessment, was justified.

psychological evaluation of R.G. at his office. In addition to considering the history of R.G.'s behavioral issues, as orally recounted by Ms. L, Dr. Goff reviewed many of the educational records and assessments that were considered by the MEDC. He also had R.G. complete a variety of psychological and intelligence tests. Based on all of the information available to him, Dr. Goff concluded that R.G. has ADHD and an obsessive-compulsive disorder. However, Dr. Goff also noted that he was uncertain whether R.G.'s behavior problems were related to "a bona fide emotional problem or psychiatric difficulty" or whether R.G. "was just doing all of this on purpose." (Pl.'s Ex. 56 at 4.) On January 20, 2007, Dr. Goff prepared, at the request of Ms. L's attorney, an addendum to his initial report in which he states his opinion that scores more than one standard deviation above the mean on the behavior rating scales should be interpreted as clinically significant. At the due process hearing, Dr. Goff testified that did not believe the behavior exhibited by R.G was typical of other children his age and that R.G. met the criteria for emotional disturbance.

Although the MEDC made its eligibility decision in April of R.G.'s first grade year, evidence concerning R.G.'s behavior during second grade was admitted at the due process hearing. At the beginning of the second grade year, the BBSST met to discuss modifications to R.G.'s behavior modification plan. The modified plan noted that R.G. would be given extra time to complete his

assignments and would continue to be allowed to visit Fleagle and receive rewards for good behavior. At the beginning of the school year, R.G. was sent to detention twice for incidents involving defiance--throwing pencils, leaving the classroom, pushing students and desks, and tearing pages out of a book. However, the behavior logs maintained by Tracey Gregg, R.G.'s second grade teacher, reflect that R.G. behaved appropriately on 63 out of 72 total school days during the first half of the school year. Indeed, Gregg testified that R.G. was generally respectful of his peers, did not talk out-of-turn, told her if he did not understand a task, had friends, and successfully participated in group activities. Fleagle testified that her interactions with R.G. progressively decreased during second grade, because his behavior improved markedly. While there were sporadic incidents of misbehavior, Ms.  L acknowledged that R.G.'s behavior improved during second grade. The records also show that R.G. performed well academically in second grade, usually making As and Bs and exceeding the benchmarks on academic achievement tests.

The due process hearing was held over the course of seven days between October 25, 2006 and January 30, 2007 before Mr. Wesley Romine, a state hearing officer. Thirteen witnesses testified and a voluminous evidentiary record was developed. Following the hearing, the hearing officer issued a due process decision that made the following specific findings: 1) the Board did not violate

the child-find provisions of the IDEA; 2) the Board's evaluation of R.G. complied with all applicable laws and regulations; 3) the Board did not deny R.G. a free appropriate public education by concluding that he was ineligible for special education services in April of 2006; 4) the Board's failure to complete the evaluation of R.G. in a timely manner deprived Ms. L of the opportunity to participate in R.G's educational progress; and 5) the Board is required to pay for the independent educational evaluation obtained by Ms. L. Because of the Board's failure to complete its evaluation of R.G. within the required sixty-day time limit, the hearing officer required the Board to initiate a new evaluation of R.G. with a number of added requirements and to complete it in a timely manner. Because both parties were dissatisfied with aspects of the hearing officer's decision, they both exercised their right under 20 U.S.C. § 1415(i)(2) to seek appellate review of his decision in this court. By enacting § 1415(i)(2), Congress did federal courts no favor, as this opinion well illustrates.

### *Standard of Review*

"The primary purpose of the IDEA is 'to ensure that all children with disabilities have available to them a free appropriate public education [FAPE] that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living.'" *M.T.V. v. DeKalb Co. Sch. Dist.*, 446 F.3d 1153, 1157 (11th Cir. 2006)

13

(quoting 20 U.S.C. § 1400(d)(1)(A)). State and local education agencies are eligible for federal assistance if they have in effect policies and procedures to ensure that they provide a FAPE[5] to disabled children. 20 U.S.C. § 1412. A parent with a complaint relating to any aspect of the provision of a FAPE may request an impartial due process hearing. *Id.* § 1415(f). In an appeal of an administrative due process decision under the IDEA, the district court:

> (i) shall receive the records of the administrative proceedings;
> (ii) shall hear additional evidence at the request of a party; and
> (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

*Id.* § 1415(i)(2)(c). The extent of deference to be given to the administrative hearing officer's findings of fact is a matter left to the discretion of the court. *See Doe v. Ala. State Dep't of Educ.*, 915 F.2d 651, 657 n.3 (11th Cir. 1990). The district court conducts an entirely *de novo* review of the hearing officer's findings. *Sch. Bd. of Collier County, Fla. v. K.C.*, 285 F.3d 977,

---

[5] A FAPE is defined under 20 U.S.C. § 1401(9) as:

> [S]pecial education and related services that-
> (A) have been provided at public expense, under public supervision and direction, and without charge;
> (B) meet the standards of the State Educational agency;
> (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
> (D) are provided in conformity with the individual education program under section 1414(d) of this title.

983 (11th Cir. 2002). While the court must consider the administrative findings of fact, it is free to accept or reject them. *Id.* The usual Rule 56 summary judgment principles do not apply in IDEA cases. *Loren F. v. Atlanta Indep. Sch. Sys.*, 349 F.3d 1309, 1313 (11th Cir. 2003). In IDEA cases, summary judgment is appropriate even where there are disputed issues of material fact. *Id.* The district court's role is essentially to make a judgment on the record. *Id.*

Although this is an independent civil action and not merely a review of the state administrative decision, the Supreme Court has determined that federal courts must still give "due weight" to the hearing officer's determinations. *See M.M. ex rel. C.M. v. Sch. Bd. of Miami-Dade County, Fla.*, 437 F.3d 1085, 1097 (11th Cir. 2006) (citing *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206, 102 S. Ct. 3034, 3051 (1982)). "To that end, administrative factfindings are considered to be *prima facie* correct, and if a reviewing court fails to adhere to them, it is obligated to explain why." *Loren F.*, 349 F.3d at 1314 n.5 (internal punctuation and citations omitted). Additionally, the court should not "substitute its own judgment on sound educational policy for those made at the state administrative level." *Jefferson County Bd. of Educ. v. Breen*, 853 F.2d 853, 856 (11th Cir. 1988) (citing *Rowley*, 458 U.S. at 206, 102 S. Ct. at 3050). The Eleventh Circuit has described the IDEA provision for judicial review as "puzzling"

15

and "somewhat confusing," *Walker County School District v. Bennett*, 203 F.3d 1293, 1297 (11th Cir. 2000), but the court will endeavor to apply the above recited standards as best it can.

***Analysis***

**1. Due Process Complaint**

As a threshold matter, the Board argues that Ms. L's due process complaint was improperly filed because her agreement with the MEDC's eligibility decision means that her complaint was not based on a preexisting disagreement with the Board, as required by state regulations. Stated differently, the Board is arguing that it has a right to be given notice of a claim and an opportunity to provide the requested relief before the due process complaint is filed. The Board's argument is based on the following state regulations:[6]

> When parents or the education agency *disagree* with matters pertaining to the identification, evaluation, educational placement of their child, and/or the provision of a free appropriate public education which sets forth an alleged violation that occurred not more than two years before the date the parent or education agency knew or should have known about the alleged action that forms the basis of the request for a hearing, an impartial due process hearing may be requested.
>
> Ala Admin. Code r. 290-8-9-.08(8)(c)(emphasis added).
>
> When the parent, the attorney representing the parent, or an official from the education agency, files a written request, the request must include the name of the child, the address of the residence of the child, the name of

---

[6] All citations to the Alabama special education regulations refer to the regulations as they existed in 2006 (i.e., before the 2007 revision).

the school the child is attending, a description of the
nature of the problem of the child relating to *the
proposed or refused initiation or change*, including facts
relating to the problem, and a proposed resolution of the
problem to the extent known and available to the party at
the time.

*Id.* 290-8-9-.08(c)(1)(ii)(emphasis added). The state regulations
track the language of 20 U.S.C. § 1415(b)(6) and (7)(A). The
hearing officer found that there are no notice requirements of the
kind contemplated by the Board in the language of the IDEA or its
implementing regulations. He also noted that Ms. L did notify the
Board of her disagreement with the MEDC's eligibility decision by
letter from her attorney dated May, 2, 2006, a few days before she
filed her due process complaint.

The interpretation of the relevant statutory and regulatory
provisions offered by the Board is interesting but unconvincing.
The May 2, 2006 letter to the Board clearly evidences a
"disagreement" with the MEDC's refusal to find R.G. eligible for
special education services and meets the notice requirements of 20
U.S.C. § 1415(7)(A). In actuality, Ms. L could have validly filed
her due process complaint without providing the Board with any form
of prior notice, because the statute states that the "notice"
requirements should be contained in the complaint itself. *See* 20
U.S.C. § 1415(7)(A)(i); 34 C.F.R. § 300.508 (listing the components
of § 1415(7)(A)(i) as items that must be included in the
complaint). Therefore, the complaint serves as notice to the
school board that a parent disagrees with its decision relating to

17

the "identification, evaluation, or educational placement of the child." In this case, Ms. L disagreed with the MEDC's refusal to initiate special education services for R.G. There is no requirement that the parent give school officials an opportunity to respond to his or her concerns before the filing of the due process complaint. *See Letter to Lenz*, 37 IDELR 95 (OSEP 2002). In any event, the resolution session required by 20 U.S.C. § 1415(f)(1)(B), which must occur within 15 days of the school board's receipt of notice of the parent's complaint, serves the purpose of giving the parties an opportunity to resolve their differences before the due process hearing.[7] Accordingly, the hearing officer correctly determined that Ms. L's due process complaint was validly filed.

## 2. Eligibility Under the IDEA

The IDEA requires that a FAPE be available to all children with disabilities between the ages and 3 and 21. 20 U.S.C. § 1412(a)(1)(A). A "child with a disability" is (1) a child who has been determined to have one of the enumerated categories of disability, including "emotional disturbance," and (2) who, by reason thereof, needs special education and related services. *Id.* § 1401(3)(A); 34 C.F.R. § 300.8(a)(1). "Special education" is

---

[7] The Board's argument that Ms. L's repudiation of the resolution agreement divests her of her right to pursue her due process complaint is meritless. The IDEA explicitly provides that any party can void a resolution agreement within three business days of the agreement's execution, as Ms. L did in this case. *See* 20 U.S.C. § 1415(f)(1)(B)(iv).

defined as "specially designed instruction, at no cost to the parents, to meet the unique need of a child with a disability." *Id.* § 1401(29). The IDEA requires school districts to conduct a "full and individual" evaluation of all students suspected of being disabled and in need of special education and related services. *Id.* § 1414(a).

Ms. L argues that R.G. qualifies under the disability category known as "emotional disturbance."[8] Under federal regulations, an emotionally disturbed child is one who exhibits:

> [O]ne or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance:
>
> (A) An inability to learn that cannot be explained by intellectual, sensory, or health factors;
>
> (B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers;
>
> (C) Inappropriate types of behavior or feelings under normal circumstances;
>
> (D) A general pervasive mood of unhappiness or depression; or
>
> (E) A tendency to develop physical symptoms or fears associated with personal or school problems.

34 C.F.R. § 300.8(c)(4)(i); *see also* Ala. Admin. Code r. 290-8-9-.03(4)(a). The Alabama regulations define "emotional disturbance" as:

> a disability characterized by behavioral or emotional responses so different from appropriate age, cultural, environmental, or ethnic norms that the [child's]

---

[8] Ms. L does not appeal the determination that R.G. does not meet the criteria for "otherwise health impaired" or "learning disabled."

educational    performance    is    adversely    affected.
Educational    performance    includes    academic    and/or
social/emotional skills. Such a disability is more than
a temporary expected response to stressful events in the
environment, is consistently exhibited in the educational
environment,    and    persists    despite    individualized
intervention within the general education [environment]
and other settings

Ala. Admin. Code r. 290-8-9-.03(4)(a). Furthermore, the state

regulations provide the following five criteria for determining

whether a child is emotionally disturbed:

1. Evidence that the problem is not due to intellectual,
sensory, or health factors.

2. Scores on three behavior rating scales that are
considered clinically significant by the test authors.
Results from three independent raters, one of whom may be
the parent, must be considered.

3. Evidence that the emotional disturbance adversely
affects    the    child's    academic    performance    and/or
social/emotional functioning in the environment.

4. Evidence that the emotional disturbance is exhibited
over a long period of time (typically six months) and to
a marked degree, and that the child's educational
performance is adversely affected.

5. Observational data that documents the emotional
disturbance in two or more educational settings.

Ala. Admin. Code 290-8-9-.03(4)(b).

The hearing officer found that R.G. did not meet the

requirements for emotional disturbance. In reaching this

conclusion, the hearing officer found that the evaluation of R.G.

conducted by the Board was adequate and that the testimony of

R.G.'s teachers and counselors was more credible than the opinions

offered by Ms. L's experts.

A. *The Evaluation*

In evaluating a child for purposes of IDEA eligibility, the school district must "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information . . . that may assist in determining . . . whether the child is a child with a disability." 20 U.S.C. § 1414(b)(2)(A); 34 C.F.R. § 300.304(b)(1). Additionally, the state regulations on "emotional disturbance" require the "[a]dministration of the same behavior rating scale by at least three persons, one of whom may be the parent, who have had contact with the child for at least three weeks." Ala. Admin. Code r. 290-8-9-.03(4)(c)(2). Although not determinative of eligibility, "[s]cores on three behavior scales that are considered clinically significant by the test authors" can be indicative of emotional disturbance. Ala. Admin. Code r. 290-8-9-.03(b)(2). In this case, Ms. L argues that the scores obtained on the behavior rating scales are clinically significant and that the scales were not administered appropriately.

R.G.'s eligibility assessment report reflects the results of three behavior ratings scales: the Behavior Evaluation Scale ("BES"), the Clinical Assessment of Behavior ("CAB"), and the Behavior Rating Inventory of Executive Function ("BRIEF"). All three scales are based on responses provided by raters to various

questions about the child's behavior. Using the responses, scores are derived, in accordance with the instructions provided in the test manuals, that purport to provide some indication of the severity of the child's behavior problems. Ms. L argues that the results of two of the scales, the BES and the BRIEF, were not properly interpreted by school officials. Specifically, she contends that both scales yielded clinically significant scores that support finding R.G. eligible for special education services.

Bell, Fleagle, Cindy Ponder[9] (a school counselor), and Kristin Yeager (R.G.'s P.E. teacher) all completed a BES as part of the eligibility determination process. The following scores were obtained:

|  | Ponder | Yeager | Bell | Fleagle |
|---|---|---|---|---|
| Total Quotient Score | 70 | 86 | 81 | 98 |
| Learning Problems subscale | 7 | 8 | 9 | 12 |
| Interpersonal Difficulties subscale | 1 | 5 | 4 | 10 |
| Inappropriate Behaviors subscale | 3 | 6 | 5 | 11 |
| Unhappiness/Depression subscale | 1 | 12 | 8 | 10 |
| Physical Symptoms/Fears subscale | 4 | 8 | 5 | 10 |

The Board interpreted total quotient scores of 70 or below and

---

[9] The Board discounted the scores obtained from Ponder, because she only saw R.G. during his worst moments. While Ms. L argues that Ponder's scores should have been retained, the court does not reach the question, because it finds that three raters did not provide clinically significant scores, even if Ponder's scores are included. The same would be true if Fleagle's scores were excluded.

subscale scores[10] of 4 or below (two or more standard deviations from the mean) to be "clinically significant." Ms. L, on the other hand, argues that, according to the BES manual, scores below 7 (more than one standard deviation from the mean) are clinically significant. Both parties agree that in order to meet the requirements of the Alabama regulations, three clinically significant scores must be obtained on the same scale or subscale by three raters.[11] As such, Ms. L contends that three clinically significant scores were obtained on both the interpersonal difficulties subscale and the inappropriate behaviors subscale. Under the Board's interpretation, the requisite three clinically significant scores were not obtained on the BES.

The dispute regarding how the BES scores should be interpreted revolves around the meaning of the term "clinically significant." School districts are required to ensure that any evaluation used for the purpose of determining IDEA eligibility is "administered in accordance with any instructions provided by the producer of the assessment." 34 C.F.R. § 300.304(c)(5). Here, the BES manual does

---

[10] The five BES subscales track the five possible characteristics of emotional disturbance as defined in federal and state regulations. *See* 34 C.F.R. § 300.8(c)(4)(i); Ala Admin. Code r. 290-8-9-.03(4)(a).

[11] Ms. L also argues that three clinically significant scores on the same individual question (or item) fulfill the requirement of the regulation. However, as the Board points out, the BES manual only states that item ratings can be use useful in programmatic development, regardless of whether a child is determined to be eligible. There is no indication that the author of the BES intended for eligibility determinations to be based on item ratings when there are no clinically significant quotient or subscale scores.

not provide a definition of what constitutes a clinically significant score. The manual states that subscale scores below 7 are "statistically atypical" and indicative of a student who is "demonstrating significant behavior deviance in the educational environment and may be far more successful with a specialized support system." (Pl.'s Ex. 53 at 28.) The manual also notes that a subscale score below 7 "represents extreme behavior significant enough to qualify the student, along with documentation from other instruments, for special program services." *Id.* However, the manual also states that a subscale score of 4 or below "indicates a standard deviation of two or more from the mean and indicates a serious level of concern."

The parties offer two reasonable interpretations of the rather cryptic instructions contained in the BES manual. Ms. L argues that subscale scores below 7 are clinically significant because they are "statistically atypical" and indicative of "significant behavior deviance." However, the Board argues that while scores below 7 are statistically significant, they are not clinically significant. It contends that the manual's reference to a "specialized support system" does not refer to special education services, but merely references a prereferral intervention strategy, such as a BBSST. The Board also notes that subscale scores below 7 only qualify the student for "special program services" if supplemented with "documentation from other instruments." In short, the Board

interprets the manual to mean that while subscale scores of 5 or 6 are serious and may require the use of intervention strategies short of special education, only scores of 4 or below are clinically significant.

Given the ambiguity of the instructions in the BES manual, the court will defer to the educational judgment of the local school officials and the state hearing officer. Even if the court adopted Ms. L's interpretation of the BES manual, the eligibility issue would not be resolved because, while "scores on three behavior rating scales that are considered clinically significant by the test authors" is one criterion supporting a finding of eligibility, the scores on the behavior scales are not determinative of eligibility. Indeed, the federal regulations provide that school districts must "[n]ot use any single measure or assessment as the sole criterion for determining whether a child is a child with a disability."[12] 34 C.F.R. § 300.304(b)(2); *see also* Ala. Admin. Code r. 290-8-9-.04(1) (noting that the eligibility determination must "[d]raw upon information from a variety of sources" and that "no single evaluation procedure will be used as the sole criterion for

---

[12] Ms. L argues that the Alabama regulations are invalid because they are in conflict with the IDEA. She bases this argument on the assertion that Alabama's regulations, contrary to definition of "emotionally disturbed" contained in federal law, require the presence of three clinically significant scores on behavior rating scales before a child can qualify as "emotionally disturbed." As previously explained, the Alabama regulations do not assign dispositive weight to the results of the behavior rating scales. While the behavior rating scales must be completed, they do not necessarily determine whether a child is eligible for services under the IDEA. As such, there is no conflict between the state regulations and federal law.

determining eligibility"). Additionally, the state regulations note that "[p]rofessional judgment should be used to determine if the results of any of the required evaluations are reliable sources of information, or if other assessment data may prove to be a more accurate indicator of the child's level of functioning." Ala Admin. Code r. 290-8-9-.03. The process for determining whether a particular child qualifies for special education services is flexible and multi-faceted; it does not turn on the results of any particular behavior rating scale. *See Maricus W. ex rel. Marvin M. v. Lanett City Bd. of Educ.*, 141 F. Supp. 2d 1064, 1068 (M.D. Ala. 2001) (noting that Alabama's IDEA regulations are not "wooden and rigid"). Indeed, an eligibility team may validly determine that a child with three clinically significant scores is not emotionally disturbed or that a child with no clinically significant scores does qualify as emotionally disturbed. While school officials must interpret behavior rating scale scores in line with the instructions provided by the test's author as part of a comprehensive evaluation process, they are allowed to use their professional judgment to fill-in any gaps that may exist. As long as the school officials' judgment is reasonable, as it is here, the court will not engage in second-guessing or micro-management. After all, this court is not a school teacher, a school administrator, or a child psychiatrist.

Ms. L also argues that the BRIEF resulted in three clinically

26

significant scores. The BRIEF was completed by Ms. L, Bell, and Ponder. The following scores were obtained:

|  | Ms. L | Bell | Ponder |
|---|---|---|---|
| Global Executive Composite (GEC) | 62 | 62[13] | 62 |
| Behavioral Regulation Index (BRI) | 67 | 69 | 73 |
| Metacognition Index (MI) | 58 | 56 | 52 |

The Board elected to consider only the GEC score and decided to consider scores of 65 or above as clinically significant. The BRIEF manual defines scores of 65 or above as "potentially clinically significant." (Pl.'s Ex. 54 at 14.) Ms. L argues that the Board should have considered the BRI scores instead of the GEC scores, because the difference between Bell and Ponder's BRI and MI scores was 13 or greater, which means, according to the BRIEF manual, that the GEC should not be used as a summary measure. *Id.* at 21.

The Board should not have used Bell's and Ponder's GEC scores for eligibility determination purposes, because Bell and Ponder had 13-point and 21-point differences respectively between their BRI and MI scores. However, because the difference between Ms. L's BRI and MI scores was only 9-points, the Board could use her GEC score. Therefore, even though Bell and Ponder provided clinically significant BRI scores, there are not three clinically significant

---

[13] The BRIEF scoring summary reflects Bell's GEC score as 68; however, the Board later discovered that the original score was incorrectly calculated and that the correct GEC score is 62.

scores, because Ms. L's GEC score remains valid and is not clinically significant. Using Bell and Ponder's BRI score as a substitute for their GEC scores does not mean that the Board would have been likewise required to use Ms. L's BRI score.

Ms. L also argues that the hearing officer ignored problems with the administration of the behavior rating scales. Specifically, she complains that the raters were not given sufficient instructions on how to complete the assessments. However, the manuals for the behavior rating scales that were administered in this case do not require each rater to read the entire manual before completing the assessment. The instructions provided on the cover of each rating scale provide sufficient information to the rater on how the assessment should be completed. While raters are called upon to exercise some degree of judgment in answering the questions on the assessments, the court is not aware of any procedural defect in the administration of the behavior rating scales that would invalidate the results.

B. *Child-Find*

In addition to quarreling with the results of the behavior rating scales and the way they were administered, Ms. L contends that the Board violated the "child-find" provision of the IDEA by waiting too long before evaluating R.G. for IDEA eligibility. The IDEA mandates that all children "in need of special education and related services [be] identified, located, and evaluated." 20

U.S.C. § 1412(a)(3)(A). However, the IDEA also cautions against the over-identification of African-American children as emotionally disturbed. *See id.* § 1400(c)(12). In accordance with the *Lee v. Macon County Board of Education* consent decree, the State of Alabama modified its child-find regulations to state that "[b]efore a child is referred to special education services, prereferral intervention strategies must be implemented in the general education program and monitored by the [BBSST] . . . for at least six weeks or longer, depending on the problem and be determined unsuccessful." Ala. Admin. Code r. 290-8-9-.01(2). The hearing officer found that the Board did not violate child-find because it used prereferral strategies, including BBSST, from the beginning of R.G.'s kindergarten year until he was referred for evaluation in December of 2005. The hearing officer also noted that Ms. L declined to have R.G. evaluated for special education services on several occasions, that R.G.'s academic performance was not being impacted by his behavior problems, and that some improvement was observed in his behavior over time.[14]

The court agrees with the hearing officer and finds that the Board acted appropriately under the circumstances in using pre-refferal strategies in an attempt to correct R.G.'s behavior

---

[14] The court notes that R.G. likely could not have been deemed emotionally disturbed even if he was evaluated during the first semester of kindergarten, given the requirement that the emotional disturbance be exhibited over a "long period of time," typically six months. *See* Ala. Admin. Code. r. 290-8-9-.03(4)(b).

problems up until the time Ms. L consented to have him evaluated in December of 2005. The Board's actions were especially appropriate in light of difficulty of determining whether a very young child is disabled or merely developing at a rate different from his peers and the possible damage that can occur, as recognized by Dr. Adams, if the child is prematurely identified as in need of special education. *See Board of Educ. of Fayette County, Ky. v. L.M.*, 478 F.3d 307, 313-14 (6th Cir. 2007).   Therefore, the Board did not violate the child-find provisions of the IDEA.

C. *Overall Eligibility*

The hearing officer found that the Board did not violate the IDEA by finding R.G. ineligible for services under the category "emotionally disturbed." Ms. L argues that the MEDC and the hearing officer should have determined that R.G. was eligible for IDEA services given his record of behavior problems during kindergarten and first grade and the testimony of her expert witnesses. Ms. L also asserts that the hearing officer improperly based his decision on the fact that R.G.'s academic performance had not been affected by his behavioral difficulties.

The eligibility question calls upon the court to make a close call. After thoroughly reviewing the administrative record, including the transcript of the seven-day due process hearing, it is clear to the court that two reasonable people viewing the evidence in its totality could come to two contrary conclusions on

30

the issue of R.G.'s eligibility under the IDEA. Ms. L depicts R.G. as a loving but seriously disturbed young boy who has demonstrated a pattern of inappropriate behavior from kindergarten to the present, despite the efforts of school officials to intervene. However, the Board suggests that R.G. is a more-or-less typical student from an economically-challenged area who had great difficulty adjusting to a structured school environment but who has gradually improved and adjusted with the continual assistance of dedicated teachers and counselors. The truth probably lies somewhere in the middle and requires a degree of educational expertise that this court lacks to discover. *See Rowley*, 458 U.S. at 208, 102 S. Ct. at 3052 (cautioning that "courts lack the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy") (internal quotation marks omitted); *Springer v. Fairfax County Sch. Bd.*, 134 F.3d 659, 663 (4th Cir. 1998) (stating that district courts interpreting the regulatory definition of "emotional disturbance" should "give deference to the state and local education authorities whose primary duty it is to administer the IDEA"); *Clay T. v. Walton County Sch. Dist.*, 952 F. Supp. 817, 823 (M.D. Ga. 1997) ("Because a federal district court does not have the expertise or experience in the field of education presumably possessed by professional educators, and does not have the opportunity to observe a student's classroom behavior over a period

31

of months as his teachers do, the Court must grant much deference to the evaluations of [the child's] teachers and the school officials."). Upon *de novo* review of the record and after giving due weight to the hearing officer's decision, the court finds that the preponderance of the evidence, combined with the need to give some deference to local educational expertise, dictates that the hearing officer's finding that R.G. was not eligible for special education services under the category of emotionally disturbed should be affirmed.

In order to be categorized as emotionally disturbed, a child must demonstrate "behavioral or emotional responses so different from appropriate age, cultural, environmental, or ethnic norms that the education performance is adversely affected." Ala. Admin. Code r. 290-8-9-.03(4)(a). The regulation also requires that the disability be "consistently exhibited in the educational environment, and persist[] despite individualized intervention within the general education [environment]." *Id.* In this case, to be termed emotionally disturbed, R.G. would also have had to exhibit "inappropriate types of behavior or feelings under normal

circumstances"[15] that persisted "over a long period of time[16] and to a marked degree that adversely affects educational performance." *Id.* "Educational performance includes academic and/or social/emotional skills." *Id.*

The critical issue is whether R.G.'s inappropriate behavior persisted over a long period of time to a marked degree despite individualized attention. The record reflects that R.G.'s behavior slowly improved from kindergarten to second grade. Fleagle testified that he behaved better in first grade than in kindergarten and better in second grade than in first grade. (Tr. at 1547-1557.) The behavior logs also reflect improvement in behavior. (Def.'s Ex. 7.) Importantly, during the period that the eligibility evaluation was being conducted, R.G.'s behavior logs reflect a marked improvement in his behavior. The improvement between first and second grade is well-documented by the testimony of Fleagle and confirmed by Ms. L's admission that R.G.'s behavior improved during the second grade. (Tr. at 1090.) Tracey Gregg, R.G.'s second grade teacher, testified that she observed

---

[15] Ms. L argues that R.G. demonstrated "an inability to build or maintain satisfactory interpersonal relationships with peers and teachers." *See* Ala. Admin. Code r. 290-8-9-.03(4)(a). However, the court finds that the testimony of R.G.'s teachers and counselors suggest that R.G. had normal relationships with his classmates and teachers. Even if R.G. did not socialize with his classmates outside of school, as Ms. L alleges, the preponderance of the evidence suggests that R.G. was well-liked by his peers and interacted with them regularly in the classroom environment.

[16] "Long period of time" is typically defined as six months. Ala. Admin. Code r. 290-8-9-.03(4)(b).

"tremendous growth in his behavior" throughout the year. (Tr. at 1261.)

While there were sporadic episodes of misbehavior throughout R.G.'s time at Center Point, the individualized attention provided through the behavior intervention plan and the BBSST succeeded in improving the trajectory of R.G.'s behavior. As such, it cannot be said that R.G.'s inappropriate behavior persisted despite individualized attention. Indeed, his behavior seems to have improved because of individualized attention. Additionally, the hearing officer was entirely justified in finding the testimony of R.G.'s teachers and counselors more credible than that of Ms. L's experts, Doctors Adams and Goff, especially since neither doctor ever observed R.G. in an educational setting. *See Alvin Indep. Sch. Dist. v. A.D. ex rel. Patricia F.*, 503 F.3d 378, 384 (5th Cir. 2007) (observing that testimony of teachers who observe child's educational progress first-hand can be more reliable than testimony of expert physicians); *Maricus W.*, 141 F. Supp. 2d at 1069 (rejecting opinions offered by experts in favor of testimony of educators). Although the court does not dismiss the experts' conclusions out-of-hand, in a case in which the eligibility decision hinges in large part on the child's behavior at school, expert testimony is less persuasive given that the experts have only observed the child on sporadic occasions in a clinical setting. This child is difficult to fit neatly into a category. He

34

might be described as *sui generis*.

Even if R.G. did meet the criteria for "emotional disturbance," he would not automatically be IDEA eligible. The IDEA defines a "child with a disability" as: 1) a child with a qualifying disabling condition (i.e., emotional disturbance) and 2) "who, by reason thereof needs special education and related services." 20 U.S.C. § 1401(3)(A). "Special education" is defined as "specially designed instruction . . . designed to meet the unique needs of a child with a disability."[17] *Id.* § 1401(29). Here, inasmuch as R.G. was responding favorably to the behavior intervention strategies utilized by his teachers and counselors, the preponderance of the evidence suggests that R.G. did not need specially designed instruction. Put differently, R.G. was benefitting from the regular education environment, as modified by the BBSST, without the need for special education services. *See Hood v. Encinitas Union Sch. Dist.*, 486 F.3d 1099, 1107 (9th Cir. 2007) (noting that "it is appropriate for  courts to determine if

_____

[17] "Specially designed instruction" means:

> [A]dapting, as appropriate to the needs of an eligible child under this part, the content, methodology, or delivery of instruction–
> > (i) to address the unique needs of the child that result from the child's disability; and
> > (ii) to ensure access of the child to the general curriculum, so that he or she can meet the educational standards within the jurisdiction of the public agency that apply to all children.

34 C.F.R. § 300.39(b)(3).

a child classified as non-disabled is receiving adequate accommodations in the general classroom--and thus is not entitled to special education services"); *Alvin Indep. Sch. Dist.*, 503 F.3d at 384 (holding that district court "properly considered evidence of [child's] academic, behavioral, and social progress in determining that [child] does not need special education services by reason of his ADHD"); *Norton v. Orinda Union Sch. Dist.*, 168 F.3d 500 (9th Cir. 1999), *cert. denied*, 528 U.S. 825, 120 S. Ct. 74 (1999) (finding child ineligible for special education services because he was benefitting from regular educational environment with some modifications provided by the school); *Katherine S. v. Umbach*, 2002 WL 226697 at *10 (M.D. Ala. Feb. 1, 2002) (finding child with behavioral and emotional problems ineligible under IDEA because she was accessing and receiving benefits from the general education environment). Accordingly, even if R.G. did qualify as emotionally disturbed, he would still be ineligible for services under the IDEA.

In contesting the hearing officer's finding of ineligibility, Ms. L argues that the hearing officer inappropriately based his decision on the fact that R.G.'s academic performance was not affected by his behavioral problems. However, a reading of the due process decision demonstrates that the hearing officer was well-aware that an evaluation of R.G.'s "education performance" should not be limited to academics. For example, the due process decision

specifically notes that "there was no evidence that [R.G.'s] emotional disturbance--if indeed the child suffered from it-- adversely affected [his] academic performance. And while it occasionally affected his social functioning in his school environment, there was no evidence that [the] behavior was to such a marked degree that [it] affected his educational performance in a significantly adverse manner." (Due Process Decision at 28.) While the hearing officer considered R.G.'s academic performance, he also looked at the effect of R.G.'s behavior on his social and emotional functioning, as required by the state regulations.[18]

D. *Additional Evidence*

Although the court allowed both parties to supplement the administrative record with evidence of R.G.'s current status in third grade, the court assigned no weight to the supplements. Supplementation was allowed on the theory that evidence of R.G.'s behavior in third grade might shed some light on the hearing officer's finding that his behavior was improving from kindergarten to second grade. However, inasmuch as R.G. moved from Center Point to Erwin Elementary School ("Erwin") for third grade, evidence of his current status is not helpful in reviewing the hearing

---

[18] The record also makes clear that the MEDC did not confine itself to a consideration of R.G.'s grades. Notably, the committee decided to conduct an additional behavioral assessment after its first meeting. Ordering an additional behavioral assessment is not at all consistent with Ms. L's portrait of school officials obsessed with academic performance to the exclusion of all else.

officer's findings, because the transition in school environments could well contribute to R.G.'s current behavioral state. Put differently, it is entirely possible that the progress that R.G. was making at Center Point could have been reversed by the move to Erwin. As such, considering evidence of R.G.'s current state that was not and could not have been considered by the MEDC or the hearing officer would impermissibly serve to "change the character of the hearing from one of review to a trial de novo." *See Bennett*, 203 F.3d at 1298. Accordingly, the court only considered the information contained in the administrative record.

## 3. Procedural Violation

Despite finding R.G. ineligible for special education services, the hearing officer found that the Board violated the IDEA by failing to complete its evaluation of R.G. within the required 60 day time limit. Because the evaluation was not completed in a timely manner, the hearing officer determined that Ms. L had been deprived of the opportunity to participate in her son's educational process. Consequently, he ordered the Board to reevaluate R.G.[19] Invoking the stay-put provisions of the IDEA, the

---

[19] The hearing officer ordered the Board to reevaluate R.G. to determine whether he qualified for IDEA services under the categories of "emotionally disturbed" or "otherwise health impaired." He also ordered that the reevaluation consider whether R.G. suffers from a learning disability and that it include a language assessment and a functional behavior assessment by an independent examiner. The hearing officer also required the Board to consider the independent educational evaluation prepared by Dr. Goff and the views of Dr. Adams.

Board refused to conduct the reevaluation until the completion of the appellate process. However, during the pendency of this appeal, the parties agreed, without prejudice to their respective appeals, to have R.G. reevaluated. Because the reevaluation consented to by the Board does not include some of the added requirements imposed by the hearing officer, the issue of a timely evaluation is not moot.

Once it is determined that a child should be evaluated for special education services, the evaluation must be completed within 60 calendar days. *See* Ala Admin. Code. R. 290-8-9-.01(f). In this case, R.G. was referred for evaluation on December 9, 2005. The MEDC, including Ms. L, met to discuss the results of the evaluation on April 4, 2006, approximately 120 days after the referral was first received. At the April 4, 2006 meeting, it was decided that an additional behavioral rating scales (the BRIEF) should be completed in order to provide a more complete evaluation. After conducting the additional rating scale, the MEDC reassembled on April 10, 2006 and found R.G. to be ineligible for IDEA services.

A hearing officer may base a finding that a child has been deprived of a FAPE on the basis of a procedural violation only if the procedural violation:

(I)   impeded the child's right to a free appropriate public education
(II)  significantly impeded the parents' opportunity to participate in the decisionmaking process regarding

> the provision of a free appropriate public
> education to the parents' child; or
>
> (III) caused a deprivation of educational benefits.

20 U.S.C. § 1415(f)(3)(E)(ii). "In evaluating whether a procedural defect has deprived a student of a FAPE, the court must consider the impact of the procedural defect, and not merely the defect *per se*." *Weiss ex rel. Weiss v. Sch. Bd. of Hillsborough County*, 141 F.3d 990, 994 (11th Cir. 1998). In this case, there is no basis upon which to conclude that the Board's delay in completing the evaluation of R.G. "significantly impeded" Ms. L's opportunity to participate in

the decision-making process. The record reflects that Ms. L was intimately involved in R.G.'s education throughout his time at Center Point. She had frequent contact with teachers and counselors and was a full participant in the BBSST and MEDC. There is no evidence that the Board attempted to deprive Ms. L of information concerning R.G.'s educational progress. Instead, Ms. L initially resisted the Board's offers to have R.G. evaluated for IDEA services. While it would have been preferable for the evaluation to be completed within 60 days, Ms. L's argument on this issue is undercut by her agreeing to have an additional behavior rating scale completed, even though such a procedure would mean that the already tardy evaluation process would take slightly longer. It is clear that the MEDC's desire to conduct a more thorough, multi-faceted evaluation contributed in some measure to the technical

procedural violation. It also bears noting that Ms. L never voiced any concern about the delay before the implementation of the due process proceeding. In short, the delay in completing the evaluation, while unfortunate, allowed the MEDC to have more data upon which to base its eligibility decision and did not impede Ms. L's ability to participate in the MEDC process. Additionally, there is no evidence to suggest that R.G. would have been deemed IDEA eligible if the evaluation had been completed within 60 days of the initial referral. *See R.B. ex rel. F.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 942 (9th Cir. 2007) ("A child ineligible for IDEA opportunities cannot lose those opportunities merely because a procedural violation takes place."); *Umbach*, 2002 WL 226697 at *17 (noting that procedural violation was "no more than de minimis" because child would not have met IDEA eligibility criteria even if the evaluation had been conducted on time). Accordingly, the Board's procedural violation amounts to harmless error.

## 4. Independent Educational Evaluation

The hearing officer ordered the Board to pay for the individual educational evaluation ("IEE") obtained by Ms. L from Dr. Goff. The Board argues that it should not have to reimburse Ms. L for the IEE because Dr. Goff's report did not meet agency criteria. Ms. L, on the other hand, contends that the hearing officer correctly concluded that reimbursement is required because the Board failed to initiate its own due process hearing to

demonstrate the appropriateness of its evaluation.

Under the IDEA, "[a] parent has the right to an independent educational evaluation at public expense if the parent disagrees with an evaluation obtained by the public agency." 34 C.F.R. § 300.502(b)(1). If a parent requests an IEE at public expense, the school board must either: "(i) [i]nitiate a hearing under § 300.507 to show that its evaluation is appropriate; or (ii) [e]nsure that an [IEE] is provided at public expense, unless the agency demonstrates in a hearing under § 300.507 that the evaluation obtained by the parent did not meet agency criteria." *Id.* § 300.502(b)(2).

As a threshold matter, the Board argues that the IDEA requires a parent who disagrees with their child's evaluation to: 1) notify the school of the parent's disagreement with the evaluation and request for an IEE, and 2) give the school an opportunity to respond to the request. However, as correctly determined by the hearing officer, the text of the IDEA and its implementing regulations contain no such "notify and wait" requirement. The regulations specifically provide as follows:

> If a parent requests an independent educational evaluation, the public agency may ask for the parent's reason why he or she objects to the public evaluation. However, **the public agency may not require the parent to provide an explanation and may not unreasonably delay either providing the independent educational evaluation at public expense or filing a due process complaint to request a due process hearing to defend the public evaluation**.

42

*Id.* § 300.502(b)(4)(emphasis added). As recognized by every circuit to consider the issue, this language does not impose any notification requirement on parents who wish to obtain a publicly-funded IEE. *See P.R. v. Woodmore Local Sch. Dist.*, 2007 WL 4163857 at *4 (6th Cir. Nov. 21, 2007); *Warren G. ex rel. Tom G. v. Cumberland County Sch. Dist.*, 190 F.3d 80, 87 (3d Cir. 1999); *Bd. of Educ. of Murphysboro Cmty. Unit. Sch. Dist. No. 186 v. Ill. State Bd. of Educ.*, 41 F.3d 1162, 1169 (7th Cir. 1994); *Hudson ex rel. Tyree v. Wilson*, 828 F.2d 1059, 1065 (4th Cir. 1987). Additionally, the Alabama regulations note that "[a] public agency may not impose conditions or timelines related to obtaining an [IEE]" except as specifically provided in the regulations. Ala. Admin. Code r. 290-8-9.02(3)(b). In this case, Ms. L notified the Board via the May 2, 2006 letter from her attorney of her disagreement with the MEDC's eligibility decision and of her intent to obtain an IEE. However, the Board contends that it did not have an opportunity to respond to Ms. L's request because she filed her due process complaint the day after the Board received the letter. While the Board may be correct in its belief in a need for parents and school officials to engage in a "progressive dialogue," its arguments are best directed to members of Congress, because the court does not have the power to amend the IDEA in the manner contemplated by the Board. In accordance with the plain language of the IDEA and the overwhelming majority of caselaw, the

court finds that Ms. L can seek and obatin reimbursement for her IEE despite failing to have dialogue with the Board.

The language of the applicable regulation gives school officials three options in the face of a parental request for an IEE: 1) initiate a due process hearing to show that its evaluation is appropriate[20], 2) pay for the IEE, or 3) demonstrate in a hearing that the evaluation obtained by the parent did not meet agency criteria. 34 C.F.R. § 300.502. In this case, because the Board neither initiated a due process hearing to demonstrate the appropriateness of its evaluation nor paid for Ms. L's IEE, its only remaining option is to prove that it demonstrated at the due process hearing initiated by Ms. L that her IEE did not meet agency criteria. The hearing officer based his finding that Ms. L is entitled to reimbursement exclusively on the Board's failure to

---

[20] 34 C.F.R. § 300.502(b)(3) states that "[i]f the public agency initiates a hearing and the final decision is that the agency's evaluation is appropriate, the parent still has the right to an [IEE], but not at public expense." However, this provision is of no help to the Board because it never initiated a hearing. In *P.R. v. Woodmore Local School District*, 2007 WL 4163857 at *4 (6th Cir. Nov. 21, 2007), the Sixth Circuit held that a school board's failure to initiate a separate hearing can be excused if the appropriateness of its evaluation was tested in a hearing initiated by a parent. However, as explained by the district court in *Woodmore*, because "the parents did not notify the district in advance that they wanted to, and had obtained an IEE . . . the district was not able beforehand to request a due process hearing to show that its evaluation was appropriate or that the parents' IEE did not meet agency criteria." *P.R. v. Woodmore Local Sch. Dist.*, 481 F. Supp. 2d 860, 861 (N.D. Ohio 2007).In this case, the Board was notified of Ms. L's desire to obtain an IEE on May 4, 2006. Ms. L obtained her IEE on October 18, 2006, and the due process hearing began on October 25, 2006. Therefore, the Board had almost six months from the date it received Ms. L's notice to request a due process hearing, but chose not to do so. In a case where the school board had ample notice of the parent's desire to obtain an IEE, the existence of a preexisting due process proceeding initiated by the parent cannot excuse the Board's failure to comply with the plain language of the governing regulations. *See Pajaro Valley Unified Sch. Dist. v. J.S.*, 2006 WL 3734289 at *3 (N.D. Cal. Dec. 15, 2006).

file a separate due process complaint and did not make any finding
as to the adequacy of Ms. L's IEE.  However, any attempt by the
Board to attack the IEE prepared by Dr. Goff is foreclosed by the
Board's failure to comply with another provision of the IDEA.

Under the IDEA, school boards "shall provide to parents, upon
request for an [IEE], information about where an [IEE] may be
obtained, and the agency criteria applicable for [IEEs]." 34
C.F.R. § 300.502(a)(2). It is undisputed that the Board never
provided Ms. L with any of the required information after she
informed the Board of her desire to obtain an IEE. When a school
fails to provide a parent with a copy of its evaluation criteria,
as required by § 300.502(a)(2), the board cannot then argue that
it should be excused from reimbursing the parent on the basis that
the parent's IEE does not meet agency criteria. *Cf. Loren F.*, 349
F.3d at 1319 n.10 (noting that district court may be justified in
denying equitable relief if parents frustrated the development an
appropriate IEP). Any perceived defect in the IEE may have been
caused in part by the Board's failure to furnish the criteria, as
required by the regulation.

Even if the Board did not waive the issue, the court finds
that Dr. Goff's evaluation, as supplemented by his addendum and
testimony at the due process hearing, does meet the criteria
contained in Ala. Admin. Code r. 290-8-9-.03(4). In addition to
conducting a wide variety of psychological, intellectual, and

45

academic achievements evaluations on R.G., Dr. Goff also reviewed the results of the evaluations considered by the MEDC. (Def.'s Ex. 14.) Based on all of the information available to him, Dr. Goff concluded that R.G. met the criteria for "emotional disturbance." (Tr. at 1810-1811.) The fact that Dr. Goff considered clinical criteria in addition to the educational criteria contained in the MEDC's report does not prevent his report, as supplemented, from being properly characterized as an IEE.

Furthermore, the Board's reliance on *Arlington Central School District Board of Education v. Murphy*, 126 S. Ct. 2455 (2006), to support its argument that Dr. Goff's testifying as an expert for Ms. L at the due process hearing forecloses Ms. L from seeking reimbursement for the cost of Dr. Goff's IEE is not persuasive. In *Murphy*, the Court simply held that the IDEA's attorney fee provision does not include expert fees. The Court's holding does not suggest that school officials are excused from reimbursing a parent for an IEE simply because the expert who prepared the IEE also testified at the due process hearing. *See A.S. ex rel. S. v. Norwalk Bd. of Educ.*, 183 F. Supp. 2d 534, 551 (D. Conn. 2002) (approving reimbursement for IEE even though it was obtained in anticipation of the due process hearing). Indeed, the Alabama regulations expressly allow IEEs obtained by parents to be used as evidence at a due process hearing. *See* Ala. Admin. Code r. 290-8-9-.02(3)(e). Because Ms. L is seeking reimbursement for the cost

of an IEE, as opposed to expert costs as part of an attorney fee award, *Murphy* has no application to this issue. Accordingly, the court agrees, albeit for somewhat different reasons, with the hearing officer's order requiring the Board to pay for Ms. L's IEE.

## 5. Rehabilitation Act Claim

Ms. L also asserts a claim under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Rehab Act"), in which she alleges that the Board discriminated against R.G. by failing to deem him eligible for services under the Act, thereby depriving R.G. of a FAPE. Because the hearing officer from whom the IDEA appeals were taken had no jurisdiction to deal with the Rehab Act claim, but to file a Rehab Act claim in this court requires an exhaustion of the IDEA remedy, the Rehab Act claim is, in effect, a separate suit consolidated with Ms. L's IDEA appeal. *See Babicz v. Sch. Bd. of Broward County*, 135 F.3d 1420, 1422 (11th Cir. 1998) (holding that litigants must "exhaust the IDEA's administrative procedures to obtain relief that is available under the IDEA before bringing suit under Section 504").

Section 504 of the Rehab Act reads, in pertinent part, as follows:

> No otherwise qualified individual with a disability in the United States, as defined in section 750(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any

> program or activity receiving Federal financial
> assistance or under any program or activity conducted by
> any Executive agency or by the United States Postal
> Service.

*Id.* § 794(a). Unlike the IDEA, "'§ 504 does not require affirmative action on behalf of handicapped persons, but only the absence of discrimination against those persons.'" *Manecke v. Sch. Bd. of Pinellas County, Fla.*, 762 F.2d 912, 921 (11th Cir. 1985) (quoting *Smith v. Robinson*, 468 U.S. 992, 1018, 104 S. Ct. 3457, 3471 (1984)); *see also Timms v. Metro. Sch. Dist. of Wabash County, Ind.*, 722 F.2d 1310, 1318 (7th Cir. 1983) ("[S]ection 504 is prohibitory, forbidding exclusions from federally-funded programs on the basis of handicap, rather than mandatory, creating affirmative obligations."); *Wegner v. Canastota Cent. Sch. Dist.*, 979 F. Supp. 147, 152 (N.D.N.Y. 1997) ("Section 504 provides relief from discrimination, whereas the IDEA provides relief from inappropriate educational placement decisions, regardless of discrimination."). In regulations promulgated pursuant to § 504, the Secretary of Education has interpreted § 504 to require a recipient of federal funds that operates a public elementary education program to "provide a *free appropriate public education* to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. § 104.33(a)(emphasis added). Given the similarity between the FAPE provisions of the IDEA and § 504, the Supreme Court has stated that "§ 504 adds nothing to [a child's]

48

right to a free appropriate public education." *Smith*, 468 U.S. at 1019, 104 S. Ct. at 3472. Therefore, to the extent that Ms. L's § 504 claim is based on a denial of a FAPE, it fails along with her IDEA claim. *See, e.g., N.L. ex rel. Mrs. C. v. Knox County Schs.*, 315 F.3d 688, 695-96 (6th Cir. 2003) ("[P]recedent has firmly established that section 504 claims are dismissed when IDEA claims brought on the theory of a denial of [FAPE] are also dismissed."); *Weiss*, 141 F.3d at 998 ("The Court finds that [the parents'] Rehabilitation Act claim is essentially the same as their IDEA claim, and fails for the same reasons that the IDEA claim fails."); *Doe*, 915 F.2d at 666 ("Plaintiffs' section 504 claims are identical to their claims under the [IDEA], which we have already held are without merit.").

To the extent that Ms. L's § 504 claim is based on conduct not at issue in her IDEA claim, it also fails because she has not proven that the Board discriminated against her son. In order to establish a § 504 violation in the special education context, the weight of the authority suggests that a plaintiff must demonstrate that the school board's educational judgment relating to the student constituted either "bad faith or gross misjudgment." *See, e.g., Sellers ex rel. Sellers v. Sch. Bd. Of Mannassas*, 141 F.3d 524, 529 (4th Cir. 1998); *Monahan v. Nebraska*, 687 F.2d 1164, 1171 (8th Cir. 1982); *C.P. v. Leon County Sch. Bd.*, 2005 WL 2133699 at *4 (N.D. Fla. 2005); *E.W. v. Sch. Bd. of Miami-Dade County, Fla.*,

307 F. Supp. 2d 1363, 1371 (S.D. Fla. 2004); *R.B. ex rel. L.B. v. Bd. of Educ. of City of N.Y.*, 99 F. Supp. 2d 411, 419 (S.D.N.Y. 2000). The "bad faith or gross misjudgment" requirement is "a way for ensuring that good faith decisions by educators do not become 'discrimination' just because a court ultimately decides that a different course was necessary." *Hamilton Sch. Dist. v. Doe*, 2005 WL 3240597 at *11 (E.D. Wis. Nov. 29, 2005).

In this case, Ms. L's claim is based on her contention that the Board violated § 504 by failing to provide services to R.G. However, the mere fact that a parent disagrees with an evaluation conducted by school officials does not mean that the school is guilty of discrimination. As noted by the Eighth Circuit in *Monahan*:

> The reference in the Rehabilitation Act to "discrimination" must require, we think, something more than an incorrect evaluation, or a substantively faulty individualized education plan, in order for liability to exist. Experts often disagree on what the special needs of a handicapped child are, and the educational placement of such children is often necessarily an arguable matter. That a court may, after hearing evidence and argument, come to the conclusion that an incorrect evaluation has been made, and that a different placement must be required under [the IDEA], is not necessarily the same thing as a holding that a handicapped child has been discriminated against solely by reason of his or her handicap. An evaluation, in other words, is not discriminatory merely because a court would have evaluated the child differently.

687 F.2d at 1170. Therefore, a parent cannot state a § 504 claim in this context unless it can be shown that school officials grossly departed from accepted standards among professional educators. *See*

*id.* at 1171; *see also Sellers*, 141 F.3d at 529 (applying "bad faith or gross misjudgment" standard in case involving parents' claim that school district failed to timely access and diagnose their child as having a disability).

Because the court finds that the Board provided R.G. with a FAPE under the IDEA, Ms. L's § 504 claim must fail. However, even if the court disagreed with the Board's eligibility decision or the sufficiency of its evaluations, there is no evidence in the record to suggest that the Board displayed "bad faith or gross misjudgment." In fact, the record reflects that R.G.'s teachers and counselors cared deeply about R.G.'s well-being and put a great deal of effort into implementing the behavior intervention plan. The MEDC's desire to perform an additional behavior rating scale in order to provide a more thorough evaluation is further evidence of educators who were genuinely concerned about R.G. While the court has acknowledged that the eligibility question is a close call, the Board's decision to deny eligibility in no way reflects "gross misjudgment." Accordingly, Ms. L cannot prevail on her Rehab Act claim.

### Conclusion

For the reasons stated above, the court will grant the Board's motion in all respects, except as it relates to reimbursement for the IEE. Conversely, apart from the IEE reimbursement issue, the court will deny Ms. L's motion. The hearing officer's decision will

be affirmed in part and reversed in part.

DONE this 4th day of January, 2008.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE